1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

TEENA R. HAMMONS,

NO.  C13-167-RSM-JPD

9

Plaintiff,

10

v.

11

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

REPORT AND
RECOMMENDATION

12

Defendant.

13

14      Plaintiff Teena R. Hammons appeals the final decision of the Commissioner of the

15   Social Security Administration ("Commissioner") which denied her applications for

16   Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.

17   §§ 1381-83f, after a hearing before an administrative law judge ("ALJ").  For the reasons set

18   forth below, the Court recommends that the Commissioner's decision be REVERSED and

19   REMANDED.

20                     I.      FACTS AND PROCEDURAL HISTORY

21      At the time of the administrative hearing, plaintiff was a forty-one year old woman with

22   the equivalent of a high school education.  Administrative Record ("AR") at 67, 88.  Her past

23   work experience includes employment as a cashier at a zoo chowder restaurant and an

24

REPORT AND RECOMMENDATION - 1

administrative assistant.  AR at 61, 85-86, 200.  Plaintiff was last gainfully employed on

October 31, 2009.  AR at 67, 199.

In January 2010, plaintiff filed a claim for SSI payments, alleging an onset date of

November 1, 2009.  AR at 31.  Plaintiff asserts that she is disabled due to degenerative disc

disease in her lower back, fibromyalgia, anxiety with panic attacks, depression, attention

deficient hyperactivity disorder ("ADHD"), sleep disorder, and obsessive compulsive disorder

("OCD").  AR at 32, 99, 106, 198.  *See also* Dkt. 15 at 1-2.

The Commissioner denied plaintiff's claim initially and on reconsideration.  AR at 97-

102, 106-09.  Plaintiff requested a hearing, which took place on July 19, 2011.  AR at 29-96.

On August 22, 2011, the ALJ issued a decision finding plaintiff not disabled and denied

benefits based on her finding that plaintiff could perform a specific job existing in significant

numbers in the national economy.  AR at 8-23.  The Appeals Council denied plaintiff's request

for review, AR at 1-6, making the ALJ's ruling the "final decision" of the Commissioner as

that term is defined by 42 U.S.C. § 405(g).  On February 1, 2013, plaintiff timely filed the

present action challenging the Commissioner's decision.  Dkt. 3.

## II.     JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3).

## III.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of

social security benefits when the ALJ's findings are based on legal error or not supported by

substantial evidence in the record as a whole.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th

Cir. 2005).  "Substantial evidence" is more than a scintilla, less than a preponderance, and is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

1    *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750

2    (9th Cir. 1989).  The ALJ is responsible for determining credibility, resolving conflicts in

3    medical testimony, and resolving any other ambiguities that might exist.  *Andrews v. Shalala*,

4    53 F.3d 1035, 1039 (9th Cir. 1995).  While the Court is required to examine the record as a

5    whole, it may neither reweigh the evidence nor substitute its judgment for that of the

6    Commissioner.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  When the evidence is

7    susceptible to more than one rational interpretation, it is the Commissioner's conclusion that

8    must be upheld.  *Id.*

9         The Court may direct an award of benefits where "the record has been fully developed

10   and further administrative proceedings would serve no useful purpose."  *McCartey v.*

11   *Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292

12   (9th Cir. 1996)).  The Court may find that this occurs when:

13        (1) the ALJ has failed to provide legally sufficient reasons for rejecting the
          claimant's evidence; (2) there are no outstanding issues that must be resolved
14        before a determination of disability can be made; and (3) it is clear from the
          record that the ALJ would be required to find the claimant disabled if he
15        considered the claimant's evidence.

16   *Id.* at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that

17   erroneously rejected evidence may be credited when all three elements are met).

18                           IV.     EVALUATING DISABILITY

19        As the claimant, Ms. Hammons bears the burden of proving that she is disabled within

20   the meaning of the Social Security Act (the "Act").  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th

21   Cir. 1999) (internal citations omitted).  The Act defines disability as the "inability to engage in

22   any substantial gainful activity" due to a physical or mental impairment which has lasted, or is

23   expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§

24   423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled under the Act only if her impairments

REPORT AND RECOMMENDATION - 3

are of such severity that she is unable to do her previous work, and cannot, considering her age, education, and work experience, engage in any other substantial gainful activity existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof during steps one through four.  At step five, the burden shifts to the Commissioner.  *Id.*  If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps.  Step one asks whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).[1]  If she is, disability benefits are denied.  If she is not, the Commissioner proceeds to step two.  At step two, the claimant must establish that she has one or more medically severe impairments, or combination of impairments, that limit her physical or mental ability to do basic work activities.  If the claimant does not have such impairments, she is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).  A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled.  *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's

---

[1] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit.  20 C.F.R. § 404.1572.

REPORT AND RECOMMENDATION - 4

residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the

Commissioner evaluates the physical and mental demands of the claimant's past relevant work

to determine whether she can still perform that work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If

the claimant is able to perform her past relevant work, she is not disabled; if the opposite is

true, then the burden shifts to the Commissioner at step five to show that the claimant can

perform other work that exists in significant numbers in the national economy, taking into

consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. §§

404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100.  If the Commissioner finds the

claimant is unable to perform other work, then the claimant is found disabled and benefits may

be awarded.

## V.   DECISION BELOW

On August 22, 2011, the ALJ issued a decision finding the following:

1.   The claimant has not engaged in substantial gainful activity since
     January 21, 2010, the application date.

2.   The claimant has the following severe impairments: degenerative disc
     disease, obesity, fibromyalgia, an attention deficit disorder, a major
     depressive disorder, and an anxiety disorder.

3.   The claimant does not have an impairment or combination of
     impairments that meets or medically equals the severity one of the
     listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.   After careful consideration of the entire record, the undersigned finds
     that the claimant has the residual functional capacity to perform less
     than the full range of light work.  Specifically, the claimant can lift or
     carry up to 10 pounds frequently, 20 pounds occasionally; stand or
     walk for one hour at a time each for a total of up to four hours in an
     eight hour workday; sitting for two hours at a time for a total of eight
     hours in an eight hour workday; occasionally climb
     ramps/stairs/ladders/ropes/ scaffolds, stoop, kneel, crouch, crawl;
     frequently balance.  As to mental residual functional capacity, the
     claimant has sufficient concentration to understand, remember and
     carry out simple, routine tasks of the kind found in unskilled work
     with specific vocational preparation (SVP) up to two.  The claimant

REPORT AND RECOMMENDATION - 5

can work superficially with the general public, meaning in the same room or vicinity or on the telephone with the general public, or in coordination with up to five co-workers, with sufficient persistence and pace to meet average production standards and make simple workplace decisions and deal with simple workplace changes.

5.  The claimant is unable to perform any past relevant work.

6.  The claimant was born on XXXXX, 1970 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed.[2]

7.  The claimant has a limited education and is able to communicate in English.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 21, 2010, the date the application was filed.

AR at 13-22.

## VI.   ISSUES ON APPEAL

The principal issues on appeal are:

1.  Did the ALJ err by rejecting the medical opinions of the treating providers and consultative physicians about the claimant's mental impairments?

2.  Did the ALJ err in rejecting plaintiff's testimony?

3.  Did the ALJ fail to properly follow Social Security Ruling 96-8p?

Dkt. 15 at 2.

_____

[2] The actual date is deleted in accordance with Local Rule CR 5.2, W.D. Washington.

REPORT AND RECOMMENDATION - 6

VII.     DISCUSSION

A.      The ALJ Erred in Evaluating the Medical Opinion Evidence

1.      *Standards for Reviewing Medical Evidence*

As a matter of law, more weight is given to a treating physician's opinion than to that of a non-treating physician because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). A treating physician's opinion, however, is not necessarily conclusive as to either a physical condition or the ultimate issue of disability, and can be rejected, whether or not that opinion is contradicted. *Magallanes*, 881 F.2d at 751. If an ALJ rejects the opinion of a treating or examining physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not contradicted by other evidence, and specific and legitimate reasons if it is. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1988). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citing *Magallanes*, 881 F.2d at 751). The ALJ must do more than merely state his/her conclusions. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)). Such conclusions must at all times be supported by substantial evidence. *Reddick*, 157 F.3d at 725.

The opinions of examining physicians are to be given more weight than non-examining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Like treating physicians, the uncontradicted opinions of examining physicians may not be rejected without clear and convincing evidence. *Id.* An ALJ may reject the controverted opinions of an examining

physician only by providing specific and legitimate reasons that are supported by the record.

*Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

Opinions from non-examining medical sources are to be given less weight than treating or examining doctors. *Lester*, 81 F.3d at 831. However, an ALJ must always evaluate the opinions from such sources and may not simply ignore them. In other words, an ALJ must evaluate the opinion of a non-examining source and explain the weight given to it. Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2. Although an ALJ generally gives more weight to an examining doctor's opinion than to a non-examining doctor's opinion, a non-examining doctor's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Orn*, 495 F.3d at 632-33.

> 2. *Treating Mental Health Providers at Sound Mental Health and Compass Health*

Plaintiff contends that the ALJ "does not even comment on the reports from Ms. Hammons' treating mental health providers at both Sound Mental Health and Compass Health. This alone is reversible error as the opinions of treating providers must be considered." Dkt. 15 at 7. With respect to Sound Mental Health, plaintiff asserts that "Ms. Hammons received treatment there in the summer and fall months of 2009. At her initial assessment in June she was diagnosed with depression, anxiety, ADHD, and OCD; Patrician Larson, ARNP noted her difficulties with concentration, focus, feeling scatter brained, and that her OCD forces her to balance out sensory input; if something is cold, she has to touch something warm." *Id*. (citing AR at 325). In July 2009, plaintiff complained of agitation, crying, anhedonia, hopelessness, worthlessness, a lack of energy, poor concentration, sleeplessness, social withdrawal, and periods of expansive energy. *Id*. (citing AR at 291). In September 2009, Ms. Larson noted

that plaintiff "struggles with attention and thought behavioral organization." *Id*. (citing AR at 305).

Plaintiff began receiving mental health treatment from Compass Health in Everett, Washington, in January 2010. "On January 19, 2010, counselor Jolene Kron diagnosed Ms. Hammons with major depressive disorder, ADHD, polysubstance dependence in remission for 2 months, chronic back pain, and assigned her a GAF score of 47." *Id*. at 8 (citing AR at 514). In administering a mental status examination, Ms. Kron noted that plaintiff's thought process was circumstantial, tangential, her mood was labile, her cognitive functioning was limited in both recent and remote memory, her speech was profuse and pressured, and her behavior was distractible. *Id*. (citing AR at 519). Similarly, psychiatrist Fran Koehler with Compass Health evaluated plaintiff on March 2, 2010, and diagnosed plaintiff with major depression, ADHD and polysubstance abuse in remission. *Id*. (citing AR at 523). She treated plaintiff on March 28, 2010, May 13, 2010, July 6, 2010, and September 13, 2010. *Id.* at 8-9 (citing AR at 525, 527, 529-30, 531-32). Plaintiff also received counseling from mental health counselor Ashley Flowers in June 2010, July 2011, January 2011, and March 2011 for depression and ADHD. *Id*. at 9 (citing AR at 533-367). Plaintiff contends that the ALJ erred by failing to "even mention any of this treatment, let alone the diagnoses and symptoms that appear consistently throughout the period at issue." *Id*.

The Commissioner responds that "although an ALJ should consider all the evidence in the record, 'the ALJ does not need to discuss every piece of evidence.'" Dkt. 17 at 13. Plaintiff asserts that "any ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 1998)). Plaintiff contends that the plaintiff can only establish error by demonstrating that the ALJ did

not "explain why significant probative evidence has been rejected." *Id.* (quoting *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984)).

With respect to the treatment notes and diagnoses from Sound Mental Health and Compass Health, the Commissioner argues that "[b]ecause the treatment records support the ALJ's decision, she was not required to discuss them." *Id.* (citing AR at 302-31). Specifically, the Commissioner argues that "none of the Sound Mental Health records [from June through October 2009] identify any limitations in excess of the ALJ's residual functional capacity assessment." *Id.* at 14 (citing *Turner v. Comm'r of Soc. Sec. Admin.,* 613 F.3d 1217, 1222 (9th Cir. 2010) (providing that when a medical opinion does not prescribe any specific limitations, an ALJ need not assume the medical source intended to include any limitations)). The Commissioner asserts that "[t]o the contrary, these medical records include regular mental status exams that contradict the totally disabling cognitive impairments Plaintiff alleged" and therefore "these records are not inconsistent with the ALJ's conclusion that Plaintiff could perform simple, routine tasks." *Id.* (citing AR at 302-03, 308-09, 313-14, 318-19, 323).

The Commissioner argues that the treatment records from Compass Health "provide further support for the ALJ's conclusions. In March 2010, Dr. Koehler examined Plaintiff and did not observe any cognitive impairments apart from noting her to be 'a bit tangential at times.'" *Id.* (citing AR at 432). Plaintiff reported that she had enjoyed her job at the zoo and "looks forward to getting a similar type job as soon as possible," and Dr. Koehler did not indicate she believed plaintiff's impairments would prevent her from doing so. AR at 432. Similarly, Compass Health Clinician Jolene Kron, MA, MHP opined that plaintiff's "symptoms appear to be stable much of the time on her current medications." AR at 541. The Commissioner argues that "these records are consistent with the conclusion that Plaintiff can perform simple and routine tasks." Dkt. 17 at 15 (citing AR at 15).

REPORT AND RECOMMENDATION - 10

Plaintiff responds that contrary to the Commissioner's argument that these treatment records support the ALJ's decision, "the treatment records paint a picture of Ms. Hammons as 'scatter brained' and disorganized, with severely impaired concentration and focus. This is entirely consistent with all the other medical documentation in the file, as well as the testimony and reports of Ms. Hammons[.]" *Id*. at 3. Plaintiff further argues that the limitations imposed by the treating providers at Sound Mental Health and Compass Health were in excess of the ALJ's RFC assessment, because Ms. Larson opined that plaintiff struggles with attention and thought behavioral organization. *Id*. at 4 (citing AR at 305). Counselor Kron opined that plaintiff has "mental health symptoms causing serious impairment in social and occupational functioning." *Id*. (citing AR at 514). On mental status exam, plaintiff's thought processes were circumstantial and tangential with limited ability to abstract, she was easily distracted, and had pressured and profuse speech. AR at 519. Dr. Kohler noted in July 2010 that plaintiff was fidgety, had rapid and pressured speech, a labile affect, flight of ideas, paranoia, and variable attention and concentration. AR at 529-30.

As a threshold matter, the Court notes that most of the treating source opinions from South Mental Health and Compass Health were from lay-witness sources, such as testimony by nurse practitioners, physicians' assistants, and counselors. An ALJ may consider such evidence, as well as "non-medical" sources, such as spouses, parents, siblings, and friends. *See* 20 C.F.R. § 404.1513(d). Such testimony regarding a claimant's symptoms or how an impairment affects her ability to work is competent evidence, and cannot be disregarded without comment. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). This is particularly true for such non-acceptable medical sources as nurses and medical assistants. *See* Social Security Ruling ("SSR") 06-03p (noting that because such persons "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by

1  physicians and psychologists," their opinions "should be evaluated on key issues such as

2  impairment severity and functional effects, along with the other relevant evidence in the file.").

3  If an ALJ chooses to discount testimony of a lay witness, he must provide "reasons that are

4  germane to each witness," and may not simply categorically discredit the testimony. *Dodrill,*

5  12 F.3d at 919.

6        Although the ALJ fails to expressly acknowledge or discuss the opinions and treatment

7  notes from Sound Mental Health and Compass Health, the Court agrees with the

8  Commissioner that there is no evidence that any of these opinions assessed functional

9  limitations that were inconsistent with the ALJ's RFC assessment in this case.  Specifically,

10  plaintiff has not identified any opinion in the treatment notes from Sound Mental Health and

11  Compass Health that assigned any specific functional limitations to the claimant, or stated that

12  plaintiff was unable to perform simple, routine tasks.

13        For example, plaintiff points to Ms. Larson's treatment note on September 16, 2009

14  that plaintiff struggles with attention and thought behavioral organization.  AR at 305.

15  However, Ms. Larson's notes on September 29, 2009 also reflected a wholly unremarkable

16  mental status exam, and notes that plaintiff was finding her current medication "only slightly

17  effective" because she was currently experiencing "overwhelming situational stress.  She has

18  moved from DOC housing and is living in Montlake Terrace with [family] . . . She is awaiting

19  permanent housing."  AR at 301.  In response, Ms. Larsen continued to adjust plaintiff's

20  medications to improve effectiveness.  AR at 299.  In addition, on January 19, 2010 Jolene

21  Kron, MA, MHP, opined that plaintiff has "mental health symptoms causing serious

22  impairment in social and occupational functioning," AR at 514, and on mental status exam,

23  commented that plaintiff's thought processes were circumstantial and tangential with limited

24  ability to abstract, she was easily distracted, and had pressured and profuse speech.  AR at 519.

REPORT AND RECOMMENDATION - 12

However, Ms. Kron also noted that plaintiff's OCD symptoms "do not impede her life at all." AR at 514.  Although plaintiff "has a history of being diagnosed with ADHD . . . [s]he is medicated for this condition."  AR at 514.

Similarly, Dr. Kohler observed in July 2010 that plaintiff was fidgety, had rapid and pressured speech, a labile affect, flight of ideas, possible paranoia, and variable attention and concentration.  AR at 529-30.  However, Dr. Kohler also observed that plaintiff was "really really stressed" from moving to Everett and "associated circumstances."  AR at 529-30.  By September 2010, Dr. Kohler's mental status examination showed only tangential thought form, but unremarkable speech, normal affect, and no concerns observed or reported regarding plaintiff's thought content, behavior, and physical appearance.  AR at 531.  In January 2011, Dr. Kohler's mental status examination showed was wholly unremarkable, and reflected "organized/intact" thought form.  AR at 534.  In March 2011, Dr. Kohler's mental status exam continued to be unremarkable, and Dr. Kohler noted plaintiff's report that she was "doing better.  There's a lot of chaos around me, but at least I'm not at the vortex."  AR at 535.

Thus, although the treating sources' opinions reflected acknowledgement that plaintiff's mental health impairments can impede her concentration and thought processes to some degree, these treatment records and mental status examinations do not include any functional limitations that were clearly inconsistent with the ALJ's mental RFC determination. As discussed above, the ALJ found that plaintiff had "sufficient concentration to understand, remember and carry out simple, routine tasks of the kind found in unskilled work with specific vocational preparation (SVP) up to two," superficial interaction with the general public or coordination with up to five co-workers, and "sufficient persistence and pace to meet average production standards and make simple workplace decisions and deal with simple workplace changes."  AR at 15.  The evidence from Sound Mental Health and Compass Health appears

REPORT AND RECOMMENDATION - 13

1    consistent with this finding.  As a result, the ALJ did not err by failing to "explain why

2    significant probative evidence has been rejected."  *Vincent*, 739 F.2d at 1395.

3            As discussed below, however, this case is being remanded for further evaluation of the

4    medical opinion evidence.  On remand, the ALJ is directed to discuss the records from South

5    Mental Health and Compass Health, and explain what weight, if any, the ALJ afforded to the

6    treating providers' opinions contained therein.

7                    3.      *Lee Gustafson, Ph.D.*

8            Lee Gustafson, Ph.D. completed a DSHS psychological assessment of plaintiff in

9    December 2009.  With respect to plaintiff's psychiatric history, he relied upon plaintiff's self-

10   report of her "long history of hyperactivity, inability to concentrate or complete tasks.  Became

11   involved with marijuana at age 13 and eventually cocaine and methamphetamine.  Ended up

12   with six felony convictions related to substance abuse."  AR at 452.  He noted that following

13   plaintiff's release from prison, she "worked for the Zoo until laid off due to seasonal layoffs.

14   Currently running out of medications.  Feeling overwhelmed.  Significant situational

15   problems."  AR at 452.  Although he noted that plaintiff has not had any psychiatric

16   hospitalizations, she "recently went to Stevens Hospital due to suicidal ideation and fears she

17   was going crazy.  She received a few days of medications that are now running out."  AR at

18   542.

19           Dr. Gustafson diagnosed plaintiff with ADHD, mood disorder NOS, amphetamine

20   dependent "in sustained remission," and obsessive-compulsive disorder.  AR at 455.  He

21   assessed a GAF score of 50, and with respect to AXIS IV factors, noted "no income, running

22   out of medication, unemployed, prison record."  AR at 455.[3]  He found plaintiff capable of

23   _____

24           [3] A GAF range of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe
     obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or

REPORT AND RECOMMENDATION - 14

1  performing simple household chores, driving, keeping impairments, and opined that any

2  impairment would last a maximum of six months. AR at 452-58. He opined that plaintiff was

3  markedly limited in her ability to understand, remember and follow complex (more than two

4  step) instructions, learn new tasks, exercise judgment and make decisions, relate appropriately

5  to co-workers and supervisors, interact appropriately in public contacts, respond appropriately

6  to and tolerate the pressures and expectations of a normal work setting, and maintain

7  appropriate behavior in a work setting. AR at 456. Finally, he opined that plaintiff would

8  remain impaired for a maximum of six months. AR at 457.

9      The ALJ afforded Dr. Gustafson's opinion "little weight" because his GAF score of 50

10  was "not an accurate estimate of the claimant's mental health function because Dr. Gustafson

11  incorrectly included factors that are not properly part of a GAF rating, such as no income,

12  unemployment and occupational functioning. More importantly, the record indicates Dr.

13  Gustafson did not review medical records and based his opinion primarily on the claimant's

14  statements, which as noted earlier have been contradictory or inconsistent." AR at 20. As an

15  example, the ALJ pointed out that Dr. Gustafson noted plaintiff reported that she went to

16  Stevens Hospital "due to suicidal ideation and fears she was going crazy." AR at 20.

17  However, the Stevens Hospital medical record notes that plaintiff ran out of her medication

18  and was afraid she would "go back on meth if she did not get a refill." AR at 20. In addition,

19  the ALJ pointed out that plaintiff identified December 2009 as the month during which she

20  relapsed on methamphetamines, and therefore Dr. Gustafson's note that "there is no indication

21  of current or recent substance abuse" is "incorrect by the claimant's own reports of relapses."

22  AR at 20. Thus, the ALJ concluded that Dr. Gustafson "did not have an accurate clinical

23  ────────────────

    school functioning (e.g., no friends, unable to keep a job)." AMERICAN PSYCHIATRIC ASS'N,

24  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).

1    picture of the claimant's mental health function without an assessment of her true drug use."

2    AR at 20.

3            Plaintiff contends that the ALJ erred by discounting Dr. Gustafson's assessment

4    because he did not review her medical records.  Plaintiff asserts that "the fact that Dr.

5    Gustafson did not review medical records does not negate the effect of his opinions – it is just

6    one factor that an ALJ must consider when evaluating opinion evidence…Indeed, Dr.

7    Gustafson's opinions should carry more weight as he was not influenced by other medical

8    reports and significantly, his opinions were remarkably similar to that of Dr. Harmon as well as

9    the treating providers[.]" Dkt. 18 at 5.  With respect to the ALJ's dismissal of Dr. Gustafson's

10   report on the basis that plaintiff may have relapsed on drugs "around the time" of his

11   assessment, plaintiff argues that "it is unclear whether Ms. Hammons relapsed before or after

12   her visit with Dr. Gustafson, but this is irrelevant as there is no assertion anywhere in the

13   record that she is actively and consistently using drugs."  *Id*. at 5-6.

14           The Commissioner responds that the ALJ properly rejected Dr. Gustafson's opinions

15   because they were based on plaintiff's unreliable self-reports and failed to account for her

16   treatment records.  Dkt. 17 at 15.  The Commissioner asserts that "the extent to which an

17   acceptable medical source is familiar with other information in [the] case record" is one of the

18   factors an ALJ must consider when evaluating medical opinion evidence.  *Id*. at 16 (quoting 20

19   C.F.R. § 416.927(d)(6)).  Thus, the Commissioner asserts that this was a proper basis for the

20   ALJ to find Dr. Gustafson's opinion less reliable.  Similarly, the Commissioner argues that the

21   ALJ could afford Dr. Gustafson's opinions less weight to the extent they are based upon

22   plaintiff's self-report, and because Dr. Gustafson was unaware of plaintiff's recent relapses on

23   methamphetamines around the time of Dr. Gustafson's evaluation.  *Id*. (citing AR at 68, 418).

24

REPORT AND RECOMMENDATION - 16

1     As a threshold matter, the Court cannot agree with the ALJ's statement that Dr.

2 Gustafson's GAF score of 50 was "not an accurate estimate of the claimant's mental health

3 function because Dr. Gustafson incorrectly included factors that are not properly part of a GAF

4 rating, such as no income, unemployment and occupational functioning."  AR at 20.  On the

5 contrary, a GAF score represents an individual's overall level of psychological, social, and

6 occupational functioning.  Specifically, it reflects a clinician's subjective judgment about the

7 severity of an individual's symptoms or functional impairments compared to the general

8 population, and when the symptom severity and level of functioning are discordant, the GAF

9 score "always reflects the worse of the two."  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC

10 AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).  As a result, Dr.

11 Gustafson could properly consider plaintiff's medical, housing, economic, or employment

12 status in evaluating plaintiff's GAF score.

13     The ALJ did not, however, err by declining to adopt Dr. Gustafson's GAF score as an

14 accurate picture of plaintiff's mental functioning.  Despite its usefulness as a tool for

15 psychological assessment, a GAF score is not determinative of mental disability or limitation

16 for social security purposes.  *See McFarland v. Astrue*, 288 Fed. Appx. 357, 359 (9th Cir.

17 2008) (citing 65 Fed. Reg. 50746, 50764–50765) (Aug. 21, 2000) ("The GAF score does not

18 have a direct correlation to the severity requirements in our mental disorders listings.").  In

19 evaluating the severity of a claimant's mental impairments, a GAF score may help guide an

20 ALJ's determination, but an ALJ is not bound to consider it.  *See McFarland,* 288 Fed. Appx.

21 at 359 (ALJ did not commit error by failing to mention the plaintiff's three GAF scores of 50);

22 *Orellana v. Astrue,* 2008 WL 398834, at *9 (E.D. Cal. Feb.12, 2008) ("While a GAF score

23 may help the ALJ assess a claimant's ability to work, it is not essential and the ALJ's failure to

24 rely on the GAF does not constitute an improper application of the law.").

1     Based upon Dr. Gustafson's handwritten comments about plaintiff's lack of "income,

2  running out of medication, unemployed, prison record," the ALJ could reasonably conclude

3  that his GAF score reflected plaintiff's subjective statements about her work and living

4  situation and situational stressors, as opposed to plaintiff's mental capabilities.  Thus, the ALJ

5  did not err by failing to assign this GAF score controlling weight.

6     The ALJ also identified several clear and convincing reasons for discounting Dr.

7  Gustafson's opinions.  As mentioned above, the ALJ found that Dr. Gustafson did not have an

8  accurate clinical picture of the plaintiff because he failed to review her medical records, and

9  was apparently unaware of plaintiff's recent relapses on methamphetamine.  As the

10  Commissioner points out, the Social Security regulations provide that in considering how

11  much weight to give to a medical opinion, "the extent to which an acceptable medical source is

12  familiar with the other information in your case record" is a relevant factor, among others, to

13  be considered in deciding the weight to give to a medical opinion.  20 C.F.R. § 416.927(c)(6).

14  Thus, the ALJ could reasonably afford Dr. Gustafson's opinion less weight than other evidence

15  in the record because he failed to review any of plaintiff's medical records before rendering an

16  opinion about her functioning.

17     Plaintiff has also reported relapsing on methamphetamines in November 2009 and

18  December 2009.  AR at 68, 418.  Specifically, she testified that in December 2009 her relapse

19  was "horrible," and that "I was up three days of hell…I was really overwhelmed, ran into an

20  ex-boyfriend and subsequently relapsed, and it was the worst ever."  AR at 57.  This evidence

21  contradicts Dr. Gustafson's statement that plaintiff's drug abuse was in "full sustained

22  remission" in December 2009.  The fact that Dr. Gustafson was apparently unaware of

23  plaintiff's recent relapses, which plaintiff has described as being "horrible" and lasting for days

24  at a time, was specific and legitimate reason for the ALJ to afford Dr. Gustafson's opinions

REPORT AND RECOMMENDATION - 18

1  less weight.  Similarly, the ALJ could reasonably discount Dr. Gustafson's opinions to the

2  extent they appeared to be based upon plaintiff's self-report, which the ALJ reasonably found

3  less than credible in light of her criminal convictions for forgery and possession of stolen

4  property, which the ALJ characterized as "crimes that speak to veracity and integrity," and her

5  inconsistent statements in the record.  *See Tommasetti*, 533 F.3d at 1041 ("An ALJ may reject

6  a treating physician's opinion if it is based to a large extent on a claimant's self-reports that

7  have been properly discounted as incredible.").  The ALJ did not err in evaluating Dr.

8  Gustafson's opinions.

9              4.     *Dana Harmon, M.D.*

10        Dana Harmon, M.D. completed a DSHS psychological assessment for plaintiff in early

11  2011.  AR at 466-79.  Specifically, Dr. Harmon conducted a clinical interview and performed

12  objective psychological testing.  AR at 466-68.  Dr. Harmon assessed a GAF score of 40, and

13  Dr. Harmon opined that plaintiff was markedly and severely limited in her cognitive and social

14  functioning.  AR at 467-68.  For example, she opined that plaintiff was completely unable to

15  learn new tasks or to maintain appropriate behavior in a work setting.  AR at 468. Dr. Harmon

16  noted that plaintiff "showed extreme problems with concentration, easy confusion, and

17  disorganized, tangential thinking during the interview.  She had a Mini Mental Status

18  Examination (MSSE) score of 23, which points to significant cognitive deficits, and had Trails

19  scores that were at Reitan's 'mild/moderate impairment' levels."  AR at 468.  She noted that

20  plaintiff's Beck Depression Inventory score was 47, which is associated with "severe" levels of

21  depression and emotional distress.  AR at 468.  She estimated that plaintiff would remain

22  impaired for a minimum of twelve months.  AR at 469.

23        The ALJ asserted that she did "not find Dr. Harmon's opinions persuasive for several

24  reasons.  First, Dr. Harmon is not a treatment provider and bases her opinion on a one-time

REPORT AND RECOMMENDATION - 19

1    exam.  Second, she relies heavily on the claimant's subjective statements, which have been

2    repeatedly inconsistent or contradictory as discussed above."  AR at 19.  The ALJ notes that

3    "the opinion is also inconsistent with the claimant's activities demonstrating substantial

4    function such as routinely utilizing public transportation, keeping appointments, tracking and

5    managing her public assistance accounts, and caring for her and family."  AR at 19.  The ALJ

6    also rejected Dr. Harmon's GAF score of 40 because it "includes the claimant's criminal

7    history as a factor in rating the GAF; a person's criminal history is not an appropriate

8    assessment of a GAF rating, which assesses the severity of a medically determinable mental

9    health impairment."  AR at 19.

10        The ALJ noted, however, that "[m]ost significantly, Dr. Harmon accepts the claimant's

11   misreport of illicit drug use, methamphetamines, noting that the claimant last used drugs and

12   alcohol about 8 years ago except for two relapses in the months after she was released from

13   prison (she was released in September 2009)."  AR at 19.  The ALJ asserted that "Dr. Harmon

14   failed to note the claimant's significant methamphetamine and cocaine history, including 6

15   felony convictions related to substance abuse, spending 6.5 years in prison for these

16   convictions."  AR at 19.  "While Dr. Harmon notes 'sustained sobriety,' in fact, the claimant

17   has been misreporting her drug/alcohol use to providers and it is reasonable to infer that she

18   similarly misreported her use to Dr. Harmon."  AR at 19.  The ALJ then pointed to several

19   inconsistencies in plaintiff's reports to other providers about the dates and frequency of her

20   relapses, including the fact that "in January 2011, one month prior to Dr. Harmon's evaluation,

21   the claimant reported to a different provider that she had had no relapses, despite a recent

22   positive urinalysis."  AR at 19.  The ALJ gave Dr. Harmon's opinions "little weight" because

23   "the claimant's misreporting of her drug use invalidates any professional psychological

24   assessment of her mental health functioning and distorts her clinical picture."  AR at 19.

REPORT AND RECOMMENDATION - 20

The ALJ's reasons for rejecting Dr. Harmon's opinions are not specific, legitimate, or supported by substantial evidence in the record. As discussed above, a GAF score represents an individual's overall level of psychological, social, and occupational functioning, and not simply "the severity of a medically determinable mental health impairment" as stated by the ALJ. AR at 219. Thus, the fact that Dr. Harmon considered plaintiff's criminal history in assessing plaintiff's GAF score was not a specific and legitimate reason for the ALJ to reject his opinion.

In addition, the fact that "Dr. Harmon is not a treatment provider and bases her opinion on a one-time exam," without more, is not a sufficient reason to discount her opinion. Like treating physicians, the opinions of examining physicians may not be rejected without legally sufficient reasons. *See Lester*, 81 F.3d at 830. Without more, the fact that Dr. Harmon was an examining physician, rather than a treating physician, was not a specific and legitimate reason to reject Dr. Harmon's opinions.

Although the ALJ asserts that Dr. Harmon "relies heavily on the claimant's subjective statements, which have been repeatedly inconsistent or contradictory," AR at 19, this is not apparent from the record. As discussed above, Dr. Harmon relied upon "clinical observations, review of records, accompanying mental status examination and [objective] test results." AR at 467. In addition to a MMSE, Dr. Harmon administered Trailsmaking testing and a Rey 15-Item Test of Malingering, which indicated "good effort and cooperation during the testing" by plaintiff. AR at 468. Dr. Harmon also administered a Beck Depression Inventory test, which showed that plaintiff was severely depressed. AR at 468. Thus, the ALJ could not reject Dr. Harmon's conclusions as being unduly based upon "the claimant's subjective statements," rather than objective testing. AR at 19. It is also not clear how Dr. Harmon's conclusions are

inconsistent with plaintiff's limited daily activities, such as performing simple household chores.  AR at 19.

The ALJ's statements about plaintiff's history of drug use are also not specific and legitimate reasons to discredit Dr. Harmon's opinion.  First, the ALJ's statement that "Dr. Harmon failed to note the claimant's significant methamphetamine and cocaine history, including 6 felony convictions related to substance abuse, spending 6.5 years in prison for these convictions" is inaccurate.  AR at 19.  Dr. Harmon noted that plaintiff "was in prison for six years on drug charges."  AR at 466.  Dr. Harmon also noted that plaintiff "has been in a stable recovery for about eight years, except for two relapses in the months after she was released for prison."  AR at 468.  Although the ALJ asserts that "the claimant has been misreporting her drug/alcohol use to providers and it is reasonable to infer that she similarly misreported her use to Dr. Harmon," AR at 19, the Court declines to discredit Dr. Harmon's opinions based upon such an assumption.  AR at 19.  Plaintiff has not identified any evidence from Dr. Harmon's evaluation suggesting that Dr. Harmon relied upon misinformation regarding plaintiff's history of drug use.

Finally, the ALJ's statement "the claimant's misreporting of her drug use invalidates any professional psychological assessment of her mental health functioning and distorts her clinical picture" is not a valid reason to discredit Dr. Harmon's opinion.  AR at 19.  The Ninth Circuit has held that it is error for an ALJ to determine whether a claimant's mental impairments are the "product and consequence" or their drug or alcohol abuse prior to determining that a claimant is disabled under the five-step inquiry.  *See Bustamante v. Massanari*, 262 F.3d 949, 954-55 (9th Cir. 2001).  If the ALJ believes that drug and alcohol abuse is a contributing factor material to a finding of disability in this case, she should conduct a separate DAA analysis in accordance with the Social Security regulations.

Accordingly, the ALJ failed to properly evaluate the opinions of Dr. Harmon.  This case must therefore be REVERSED and REMANDED so that the ALJ can re-evaluate Dr. Harmon's opinions, in light of the comments above.  As mentioned above, the ALJ is also directed to evaluate the opinions of plaintiff's treating providers from Sound Mental Health and Compass Health, which the ALJ failed to acknowledge in her written decision.

### 5.    *Remaining Medical Evidence*

Because this matter is being remanded for further evaluation of the medical opinions of Dr. Harmon, the ALJ is further directed to re-review the opinions of the remaining providers identified in accordance with the *Orn* hierarchy of medical evidence discussed above.  Specifically, if the ALJ is going to credit a DDS physician who has never examined the plaintiff over the opinions of treating and examining providers, the ALJ must better explain how that opinion is more "consistent with the claimant's mental health medication history and psychological assessments . . . discussed above."  AR at 19.

### B.    On Remand, the ALJ Should Re-Evaluate Plaintiff's Credibility

Plaintiff contends that "the ALJ's credibility determination provides the lynchpin for the entire decision; she improperly determines that Ms. Hammons is not credible with respect to a select number of minor issues which provides the foundation for dismissing all the medical evidence."  Dkt. 18 at 9.  Plaintiff also alleges that the ALJ improperly rejected plaintiff's statements without providing clear and convincing reasons for doing so.  *Id.*  The Commissioner responds that the ALJ's adverse credibility determination was supported by substantial evidence.  Dkt. 17 at 4-12.

Here, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not

1    credible[.]"  AR at 26.  Because this case is being remanded for reconsideration of the medical

2    evidence, and the Court has found that credibility determinations are inescapably linked to

3    conclusions regarding medical evidence, 20 C.F.R. § 404.1529, the ALJ's credibility finding is

4    also reversed and the issue remanded.  After re-evaluating the medical evidence, the ALJ

5    should reassess plaintiff's testimony, and provide clear and convincing reasons for rejecting it

6    should such a conclusion be warranted.

7          C.      The ALJ Should Re-Evaluate Plaintiff's RFC

8          Finally, plaintiff contends that the ALJ's RFC assessment in this case "is contrary to

9    SSR 96-8p and is not supported by substantial evidence" because the "ALJ failed to consider

10   'all' medical opinions, as required by SSR 96-8p."  Dkt. 15 at 18 (citing SSR 96-8p ("RFC is

11   an assessment of an individual' ability to do sustained work-related physical and mental

12   activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis'

13   means 8 hours a day, for 5 days a week, or an equivalent work schedule."))  Plaintiff further

14   argues that the ALJ failed to "address plaintiff's reaction to stress, as mandated by SSR 85-

15   15," in light of plaintiff's mental impairments.  *Id.*

16         The Commissioner responds that plaintiff's "contention merely repeats arguments

17   advanced elsewhere . . . The Court should uphold the ALJ's [RFC] because it properly took

18   into account limitations for which there was record support that did not depend on Plaintiff's

19   subjective complaints that lacked credibility."  Dkt. 17 at 22.  With respect to plaintiff's

20   argument that the ALJ failed to properly account for her reaction to stress, thereby violating

21   SSR 85-15, the Commissioner argues that plaintiff has failed to point to evidence showing how

22   stress limited her specifically."  *Id*. at 23.  Although plaintiff relies on the fact and she and her

23   daughter both testified that plaintiff decompensates under stress, the Commissioner asserts "the

24   ALJ provided numerous reasons for concluding Plaintiff was not a reliable source for

REPORT AND RECOMMENDATION - 24

determining the severity of her impairments" as well as "giving little weight to the opinion of Plaintiff's daughter." *Id.*

Plaintiff's remaining assignment of error regarding the RFC assessment is essentially a restatement of her arguments regarding the medical evidence. As discussed above, this case is being remanded for a reevaluation of the medical opinion evidence, as well as plaintiff's credibility. The ALJ's RFC assessment, which includes plaintiff's ability to tolerate stress in the workplace, is inescapably linked to her prior conclusions regarding this evidence. On remand, the ALJ shall reconsider plaintiff's RFC, and include any limitations regarding plaintiff's ability to tolerate stress in light of her mental impairments.

## VIII.   CONCLUSION

For the foregoing reasons, the Court recommends that this case be REVERSED and REMANDED to the Commissioner for further proceedings not inconsistent with the Court's instructions. A proposed order accompanies this Report and Recommendation.

DATED this 13th day of September, 2013.

*James P. Donohue*

JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION - 25